# Protosenia *v.* Brothers Valley Coal Company, Appellant.

*Negligence—Master and servant—Mines and mining—Assump-
tion of risk—Assurance of safety—Contributory negligence—Case
for jury.*

In an action against a mining company to recover damages for
personal injuries sustained by an employee as a result of certain
defects in a coal cutting machine which plaintiff was operating,
the case is for the jury and a verdict for the plaintiff will be sus-

tained where it appears that plaintiff, who was a foreigner of limited education and unfamiliar with the working of the machine, called the attention of the superintendent to the defects therein but was told to go back to his work, that the electrician would be sent to repair the defects; that the electrician examined the machine and instructed plaintiff that it could be operated safely in a certain manner in spite of the defects, and plaintiff, while endeavoring to follow such instructions, sustained the injuries complained of.

Argued Sept. 28, 1915. Appeal, No. 230, Oct. T., 1915, by defendant, from judgment of C. P. Somerset Co., Dec. T., 1914, No. 211, on verdict for plaintiff, in case of Andy Protosenia v. Brothers Valley Coal Company, a Corporation. Before BROWN, C. J., MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ. Affirmed.

Trespass to recover damages for personal injuries.

The facts appear in the following opinion of RUPPEL, P. J., sur defendant's motion for a new trial and for judgment n. o. v.:

The plaintiff recovered a judgment for $2,850.00 for injury sustained by him on the 12th of November, 1913, while operating a coal-cutting machine in the mine of the defendant company. The defendant now asks us to enter judgment non obstante veredicto because it claims that plaintiff failed to establish the charge of negligence against the defendant. The facts as developed before the jury were brief and perhaps not as clear as could have been desired, but it was shown by the plaintiff and his witnesses that he was operating this coal cutting machine which was controlled by electricity; that he had been working with the machine for some time when he discovered, as he thought, that something was wrong; he was not an electrician, not familiar with the machine, was a foreigner with very limited education, and he could not tell what the trouble was. He went to the superintendent and complained to him that the machine would not work properly, that it jerked or jumped, and

he was fearful of an accident, and asked the superin-. tendent for his pay, stating that he intended to quit because of the danger that he feared from the machine. The superintendent assured him that the machine was not dangerous and told him to go back to his work, that he would send the electrician to make a thorough examination and if it needed repairs the electrician would make them. Upon this assurance plaintiff resumed his work and some time thereafter the company's electrician called to examine the machine and told him to go on with it, that there was no trouble, that one of the points or indicators for guidance of the controller was missing, but that when moving the lever if it became necessary to pass that point, simply to jump it quickly to the next higher point and that there would be no trouble. Relying upon the representations of the electrician, he continued to use the machine. On the day of the accident he was trying to move it from one position to another preparatory to loading it on a truck to take it to another room, and in order to do this a jack was fastened in the mine, the lower part in the ground and the upper part in the roof of the mine, and a wire rope attached to this jack was used to draw the machine toward the jack, and the whole power of moving the machine, as well as operating it when in use, was furnished by electricity.

This movement of the machine is tersely stated in defendant's brief which has been furnished us: "There is an eye in one end of this wire rope and this eye is put over the iron jack. This iron jack is imbedded in the roof of the coal and in the floor of the mine, and is just an upright post; then when the electricity is applied to the drum or windlass on the coal cutting machine that winds up the rope and consequently draws the coal cutting machine nearer and nearer the iron jack." Plaintiff testified that when he undertook to draw the machine over toward the jack on the day of the accident, he first placed the lever or controller at the figures of the index, first at one, two and three, and not getting sufficient

power to move the machine, he followed the instructions given him by the electrician and quickly jumped past No. 4 to No. 5 and that this movement seemed to produce suddenly too much power, causing the machine to lurch or jump so quickly as to catch the plaintiff's arm between the machine and the jack, and thus severely injuring him. There were no witnesses to the accident and no person undertook to fully explain the intricacies of the machine. As stated before, the plaintiff claimed to have no knowledge whatever of the construction or operation of the machine except such as was furnished him by the electrician. Had the plaintiff's case rested upon the occurrences on the day of the accident, then there could have been no recovery; the plaintiff would have failed because his evidence did not establish any knowledge of any defects on part of the company or its representatives, and the authorities relied upon by the defendant would apply: Mixter v. Imperial Coal Company, 152 Pa. 395; Higgins v. T. J. Fanning & Co., 195 Pa. 599; Alexander v. Penna. Water Co., 201 Pa. 252; Marsh v. Lehigh Val. R. R. Co., 206 Pa. 558; Clark v. Garrison Foundry Co., 219 Pa. 426; Brynelson v. Turner-Forman Concrete Steel Co., 239 Pa. 346; De-Marco v. Standard Steel Car Co., 247 Pa. 174; Ceen v. William Cramp & Sons Ship & Engine Bldg. Co., 249 Pa. 415.

But the plaintiff went farther: He testified positively that he called upon the superintendent of the company and complained to him that he feared there was something wrong with the machine and was afraid to work it and wanted his pay so he could quit work and seek employment elsewhere, but resting upon the assurance given him by the superintendent and the subsequent positive statements of the electrician that the machine was all right, he continued his employment. In this he is corroborated by another witness. It is true the superintendent was called as a witness by the defendant and denied in part at least the testimony of the plaintiff

in this respect, but this left the question of fact for the determination by the jury. Surely with this evidence on part of the plaintiff, the court could not have withdrawn the case from the jury. That there was a defect of some kind is manifest from the testimony even of the witnesses for the defendant; that there was a serious accident is not questioned, and under all the facts and circumstances, the case was for the jury. The failure by plaintiff to produce expert testimony as to the condition of the machine or cause of the accident was a proper subject for argument to the jury, but it cannot be conclusive in controlling the action of the court. It is a singular fact that the electrician, Mr. Driggs, who was in the employ of the company at the time of the accident was not called to testify. He must be presumed to have special knowledge of the construction and workings of this machine; he had control of the machine at the time of the accident and no reason was suggested at the trial why the company did not produce him as a witness. It was known that this particular machine was the alleged cause of the accident, and if it was in proper repair, or if the plaintiff's allegations were false with regard to the representations made by the electrician, he could have been called to explain. Several witnesses were called by the defendant in an effort to overcome the plaintiff's allegation as to the defective machine, but none of them throw much light upon the question. The man who was mine foreman at the time, Thomas Campbell, was called and testifies that he saw the machine after the accident, and on the same day of the accident, but he makes no statement as to the condition of the machine at the time, and simply says, "Mr. Driggs was the electrician and had charge of the electrical apparatus." Walter Albright testified that he had had about four years' experience with this machine and that the next day after the accident he worked it and continued to use it without any repairs for about four weeks when a new controller cylinder was put in; and says that dur-

ing those weeks the machine worked as well as ever. But if the machine was perfect and needed no repairs, the question naturally arises, why was it necessary to put in a new controller cylinder in four weeks after the accident? Is this not rather a corroboration as to plaintiff's theory as to the defect? John Swanson says he saw the machine next morning, that the jack was bent, and that when he undertook to load the machine "it didn't start at all at first......the fuse had burned out"; that after putting in a new fuse the machine seemed to be all right. Frank Albright testifies that the accident occurred about 9 o'clock a. m., and about 4:30 p. m. of the same day he saw the machine, but "I never touched it; just left her set the way she was....... Well, I went up the next morning to load it on the truck to move it out of the room, and I went there and asked the boys, what is the matter; they said she won't start." And after further explanation as to the trouble they had in getting the machine loaded he states that it moved all right after they had it on skids and had put in a new fuse."

It will be noticed in the first place that there is an entire absence of testimony here of those whose duty it was to have examined this machine immediately after the accident to have determined if possible what was the cause of the accident; but even with all this, under the authorities above referred to there could have been no recovery in the absence of knowledge having been traced to the company at a prior date relative to the unfit condition of the machine, but the plaintiff and another witness having testified as to this knowledge having been carried to the superintendent, brings the case clearly within the line of cases in which it is held, that the company is bound to provide safe tools for the employee. The facts were not as stated in Bradbury v. Kingston Coal Co., 157 Pa. 231, on page 244:

"In the fourth place, the testimony develops at best simply a case of ordinary accident resulting from an un-

foreseen cause, not discoverable in advance of its occurrence, with no visible defect in any part of the machinery, and no knowledge of any defect on the part of the men who were constantly using the machinery, or of the company that employed them."

The language of Mr. Justice MESTREZAT, in Webster v. Monongahela River Consolidated Coal & Coke Company, 201 Pa. 278, is applicable (p. 285) :

"The verdict establishes the fact that the condition of the timber was not such as to make the danger imminent and further that the plaintiff continued his work on the assurance of the superintendent that if the timbers were unsafe they would be removed and the place made secure.    This finding relieves the plaintiff from the charge of contributory negligence.    When a servant remains in the service of his master after he has knowledge of the dangerous condition of the place in which he is engaged, he is presumed to assume the risk of the danger; but this presumption is rebutted if the master promises to repair the defect and the danger is not so obvious or imminent that negligence can fairly be imputed to the servant for exposing himself to it."    See also Foster v. National Steel Co., 216 Pa. 279.

"The standard or measure of safety depends upon the kind and character of work done.    Some kinds of work are more dangerous than others and some tools and machinery are more complicated and necessarily involve more risk than other kinds.    These varying conditions must always be taken into account in determining the measure of safety required in such cases."    Per Mr. Justice ELKIN in Reed v. American Dyewood Co., 231 Pa. 431; Glass, Jr., v. College Hill Borough, 233 Pa. 457; Collins v. Northern Anthracite Coal Co., 241 Pa. 55; Watson v. Monongahela River Consolidated Coal & Coke Co., 247 Pa. 469; Hartman v. Reading Wood Pulley Co., 38 Pa. Superior Ct. 587; Rauhauser v. York Manufacturing Co., 50 Pa. Superior Ct. 506; Price v. Ætna Connellsville Coke Co., 63 Pitts. L. J. 14.

Under these authorities and others that might be cited we are constrained, notwithstanding the very able and ingenious argument of counsel for the defendant, to refuse the motion for judgment in favor of the defendant.

Verdict for plaintiff for $2,850 and judgment thereon. Defendant appealed.

*Errors assigned* were in refusing to direct a verdict for defendant and in refusing to enter judgment for defendant n. o. v.

*Wm. A. Stone,* of *Stone & Stone,* with him *J. G. Ogle, Alexander King* and *J. Thomas Hoffman,* for appellant.

*Chas. F. Uhl,* of *Uhl & Ealy,* with him *John Duggan, Jr.,* for appellee.

PER CURIAM, October 28, 1915:

That the plaintiff was entitled to judgment on the verdict is clearly demonstrated in the opinion of the court denying judgment for the defendant n. o. v., and on that opinion the appeal is dismissed and the judgment is affirmed.